**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**RICHARD BALTIMORE, III,**

    **Plaintiff,**

       **v.**

**HILLARY CLINTON, Secretary,**
**United States Department of State,**

    **Defendant.**

**Civil Action No.  09-0458 (JDB)**

---

## MEMORANDUM OPINION

Plaintiff Richard Baltimore, a former ambassador, brought this action against the State Department challenging a Foreign Service Grievance Board (FSGB or "Board") decision that upheld three charges of misconduct and the assessment of a 45-day penalty. The parties have filed motions and cross-motions for summary judgment. For the reasons explained herein, the Court will deny Ambassador Baltimore's motion for summary judgment and will grant the Department's cross-motion.

## BACKGROUND

The events at issue in this case concern a rug, a car, and a health club membership, hardly the usual subjects of extended federal court litigation. Plaintiff Baltimore is a retired Foreign Service Officer who has had a long and highly distinguished career. As relevant here, he served as a Principal Officer in Jeddah, Saudi Arabia from 1999 to 2002 and as the U.S. Ambassador to Oman from 2002 to 2006. See Baltimore, FSGB Case No. 2006-057, at 5 (Sept. 9, 2008) ("Bd. Decision"). During the Ambassador's time in Oman, the Department's Office of Inspector

1

General (OIG) received a complaint that the Ambassador had accepted a free membership in an employee association and that his wife was misusing a government-owned vehicle. A few months later, OIG began an investigation and, in October 2004, submitted a report documenting misconduct. On March 23, 2006, the Department sent Ambassador Baltimore a letter proposing to suspend him for 45 days without pay. Id. at 7. The letter listed three charges: (1) misuse of official position, (2) failure to report the gift of a carpet in 2002 on the 2002 financial disclosure form, 2002 SF-278, and (3) willful misuse of a government-owned vehicle. See id. at 7-8. The first charge contained three specifications: (1) soliciting and receiving a free membership to the Muscat Employee Association, (2) receiving a complimentary beach and country club membership to the Al Bustan Palace Hotel and a complimentary Diplomatic Club membership to the Grand Hyatt Hotel, and (3) accepting a gift of a carpet from a prohibited source or given because of the employee's official position. See id.

After Ambassador Baltimore responded, the deciding official issued a decision letter sustaining the proposed misconduct and the 45-day suspension. See Administrative Record ("A.R.") at 1258-74 [Docket Entry 40] (Nov. 22, 2011). The Ambassador soon retired, never having served the 45-day suspension. See id. at 1011 (Stipulation 2).[1] Ambassador Baltimore filed a grievance with the Bureau of Human Resources, and when it was denied he appealed that decision to the FSGB. The parties engaged in discovery and held an evidentiary hearing before the Board. See Bd. Decision 9-10.

The Board rejected, as not proven, two specifications: (1) soliciting and receiving a free membership to the Muscat Employee Association, and (2) receiving a complimentary Diplomatic

---

[1] The suspension nonetheless carries consequences for Ambassador Baltimore. First, the decision letter remains in his file, but would be removed if he were exonerated. Second, during the course of the investigation he was disqualified from performance and bonus pay, and if the charges were set aside he would be reconsidered for those payments. See Bd. Decision 17, 36.

Club membership to the Grand Hyatt Hotel. It found, by a preponderance of evidence, that the remaining claims were proven, and sustained all three charges. It also sustained the 45-day suspension, but directed the Department to reissue the decision letter, removing reference to the two rejected specifications. See id. at 36. Ambassador Baltimore requested reconsideration, repeating two arguments that he raised in his initial briefing before the Board and adding that the penalty was excessive. See Baltimore, FSGB Case No. 2006-057, at 3-4 (Jan. 13, 2009). The Board denied the motion in an 11-page order, and Ambassador Baltimore filed this suit.

In this Court, the Ambassador moved to take discovery regarding a Federal Register notice, which, he argued, established that the gift of the carpet (relevant to Charge 1, Specification 3 and Charge 2) was accepted by the Department rather than by him individually. See Pl.'s Mot. for Disc. [Docket Entry 14] (Oct. 9, 2009). Instead, the Court remanded the relevant charges to the FSGB for additional consideration. See Order Remanding Case [Docket Entry 20] at 3 (Nov. 16, 2009). The Board then found that the Federal Register notice has "no relevance that would cause the Board to grant [Ambassador Baltimore] further discovery, reopen the proceedings or mitigate the penalty promulgated by the Department and sustained by the Board." Baltimore, FSGB Case No. 2006-057R [Docket Entry 23-1] at 3 (Aug. 3, 2010) ("Remand Decision"). In light of that decision, the Court denied Ambassador Baltimore's renewed motion for discovery. Order Denying Discovery [Docket Entry 29] at 8 (May 6, 2011). The parties then filed motions and cross-motions for summary judgment, which are now before the Court.

**STANDARD OF REVIEW**

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In a case involving review of a final agency action under the Administrative Procedure Act, 5 U.S.C. § 706, however, the standard set forth in Rule 56(a) does not apply because of the limited role of a court in reviewing the administrative record. See Loma Linda Univ. Med. Ctr. v. Sebelius, 684 F. Supp. 2d 42, 52 (D.D.C. 2010) (citing Sierra Club v. Mainella, 459 F. Supp. 2d 76, 89 (D.D.C. 2006)), aff'd, 408 F. App'x 383 (D.C. Cir. 2010); see also Am. Bioscience, Inc. v. Thompson, 269 F.3d 1077, 1083 (D.C. Cir. 2001) ("[W]hen a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal. The entire case on review is a question of law." (footnote and internal quotation marks omitted)). Under the APA, it is the role of the agency to resolve factual issues to arrive at a decision that is supported by the administrative record, whereas "the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." See Occidental Eng'g Co. v. INS, 753 F.2d 766, 769-70 (9th Cir. 1985); see also James Madison Ltd., by Hecht v. Ludwig, 82 F.3d 1085, 1096 (D.C. Cir. 1996) ("Like appellate courts, district courts do not duplicate agency fact-finding efforts. Instead, they address a predominantly legal issue: Did the agency articulate a rational connection between the facts found and the choice made?" (internal quotation marks omitted)). Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review. See Richard v. INS, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977); see also Fla. Power & Light Co. v. Lorion, 470 U.S. 729,

743-44 (1985) ("The task of the reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court.").

Ambassador Baltimore challenges the FSGB's decision. The Court must "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2); see also 22 U.S.C. § 4140(a) (section 706 applies "without limitation or exception" to challenges of FSGB final actions). The "scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). The Court must be satisfied that the agency has "'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" Alpharma, Inc. v. Leavitt, 460 F.3d 1, 6 (D.C. Cir. 2006). The agency's decisions are entitled to a "presumption of regularity," Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 415 (1971), and although "inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one," id. at 416. The Court's review is confined to the administrative record, subject to limited exceptions not at issue here. See Camp v. Pitts, 411 U.S. 138, 142 (1973) ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."); see also James Madison Ltd., 82 F.3d at 1096 (the district court's inquiry is predominantly legal, though the court may "need to resolve factual issues regarding the process the agency used in reaching its decision," which, in rare instances, could "require[] district courts to engage in independent fact-finding").

## ANALYSIS

Ambassador Baltimore contends that the FSGB's decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A); see also 22 U.S.C. § 4140(a) (applying APA standard to FSGB final actions). He raises a slew of challenges. None have merit. The Board's decision is thorough, well-reasoned, and consistent with its precedent as well as with general legal principles. Ambassador Baltimore has failed to point to any specific error that would allow this Court to set aside that decision.

### I.      Charge 1: Misuse of Official Position

The Board sustained the first charge against Ambassador Baltimore, that he violated regulations barring an employee from "directly or indirectly[] solicit[ing] or accept[ing] a gift" either "[g]iven because of the employee's official position" or received "[f]rom a prohibited source." 5 C.F.R. § 2635.202(a)(2). The Board found two specifications proven under this charge. Ambassador Baltimore challenges each finding.

### a.  Al Bustan Palace Hotel Membership

Ambassador Baltimore raises a number of challenges to Charge 1, Specification 2a. That specification concludes that he received a complimentary beach and country club membership to the luxurious Al Bustan Palace Hotel in violation of the gift regulation and the Department's policies. See 2 U.S. Department of State Foreign Affairs Manual § 962 ("Manual") (explaining Department policies as to "Solicitation and Acceptance of Gifts"). The Foreign Affairs Manual specifically addresses gifts of club membership, stating that "the Department may approve the acceptance of a gift of a free club membership to a U.S. official abroad" in "some unusual cases" where such access would substantially aid the official in the conduct of foreign affairs. Id.

6

§ 962.1-9. It also specifies that to request such approval employees are to contact the relevant executive office, which will consult with the Department's ethics office. Id.

The Board found, based largely on undisputed facts, that a secretary contacted Ambassador Baltimore in the summer of 2002, while he was still in Washington, D.C., and asked him to provide certain information so she could submit an application on his behalf for a complimentary membership to the Al Bustan Palace Hotel, which would permit the Ambassador to use the hotel's amenities such as the swimming pool and health club. Bd. Decision 24. The secretary indicated that it was customary for all ambassadors to Oman to receive such memberships. Ambassador Baltimore provided the information and asked that the membership also be extended to his elderly father. Id. Soon after arriving in Oman, the Ambassador received a letter from the hotel's general manager welcoming him and his family as complimentary club members. The letter was dated November 7, 2002. Ambassador Baltimore never responded. His family checked out the facilities, though he himself never used the membership. A.R. 1013 (Stipulation 34). The Ambassador did not seek approval from the Department until a Management Officer advised him to do so upon learning of the gift in June 2003. Bd. Decision 24. Ambassador Baltimore then contacted the Department's ethics office, which advised that acceptance of the membership was not appropriate and that the Ambassador should surrender the membership, which he then did. Id. at 24-25. The Board found that these facts established a violation of the regulation, that minimal use of the membership did not absolve the Ambassador, and that the acceptance created the appearance of impropriety. Id. at 25.

Ambassador Baltimore argues that the Board erred because insufficient evidence supports a finding that he accepted the membership. Simply providing information to the secretary, he maintains, was not sufficient for acceptance, especially because his family did not use the

membership. This argument ignores the record: the Ambassador stipulated both that he "accepted" the membership "from November 7, 2002 to October 2003," A.R. 1013 (Stipulation 30), and that his family "used the complimentary membership . . . on one occasion." Id. (Stipulation 34). Needless to say, the Board did not abuse its discretion in finding facts that were subject to the joint stipulation.[2]

Next, Ambassador Baltimore suggests that he was charged with violating the wrong provision because the part of the manual cited is titled "Solicitation and/or Acceptance of Gifts By the Department of State," 2 Manual § 960, and so "does not apply to gifts to individuals," Pl.'s Mot for Summ. J. [Docket Entry 32] at 22 (Aug. 5, 2011) ("Pl.'s Mot.") (emphasis omitted). This argument is frivolous. The regulations that form the basis of the charge explicitly bar "an employee" from "accept[ing] a gift" given because of his "official position." 5 C.F.R. § 2635.202. And the manual section cited in the charges, 2 Manual § 962.1-9, addresses gifts of club membership "to a U.S. official abroad"—the precise issue here—specifying that such memberships will be approved only on rare occasions. 2 Manual § 962.1-9.

The Board also erred, Ambassador Baltimore argues, when it declined to excuse his conduct under 5 C.F.R. § 2635.205(c). That section excuses an employee who, "on his own initiative, promptly complies with the requirements of this section." 5 C.F.R. § 2635.205(c). And it provides that an employee "who promptly consults his agency ethics official to determine whether acceptance of an unsolicited gift is proper" and who returns the gift if so advised, will be deemed to "have complied with the requirements of this section on his own initiative." Id. The

---

[2] Even aside from the stipulation, the Board could reasonably conclude that affirmatively providing information while knowing it will be used to apply for membership and then remaining silent in the face of a welcome letter and membership cards constitutes acceptance.

Board found that Ambassador Baltimore's consultation with the ethics office was neither prompt nor on his own initiative.

Ambassador Baltimore argues that "prompt" need not mean prior to acceptance; the regulation contemplates the <u>return</u> of a gift, so it must anticipate post-acceptance consultation. <u>See</u> Pl's Mot. 23. And he contends that it is irrelevant that a Management Officer advised him to consult the ethics office because any employee who promptly consults the agency ethics official (whether or not that consultation is <u>itself</u> on the employee's own initiative) is deemed by the regulation to "have complied . . . on his own initiative," 5 C.F.R. § 2635.205(c). The Court need not address the latter point, for if the Board reasonably concluded that the Ambassador's consultation with the ethics office was insufficiently "prompt," the exception does not apply.

The Board's promptness finding was indeed reasonable. Ambassador Baltimore was aware that the secretary would submit a membership application before he even arrived in Oman, and could have been reasonably expected to check with the ethics office at that time. Unlike the receipt of an unexpected gift that allows no time for preemptive consultation, this process gave the Ambassador ample opportunity to confer with the Department before any application was submitted. Moreover, even after arriving in Oman and receiving the welcome letter and membership cards, he waited eight months before asking for guidance. Ambassador Baltimore has not argued that he was unable to obtain guidance earlier or explained how such a substantial delay would be consistent with a regulatory scheme that emphasizes avoiding the appearance of impropriety. He has offered no reason at all that the Board's conclusion in this circumstance that his request for guidance was not "prompt" was flawed. And, in fact, the Board declined to sustain a charge against the Ambassador for accepting another membership because he consulted the ethics office two weeks after receiving the welcome letter. <u>See</u> Bd. Decision 26. Treating a

two-week delay as prompt but an eight-month delay as not prompt is hardly arbitrary and capricious.

### b. Accepting Carpet from Prohibited Source

The parties next dispute the propriety of Charge 1, Specification 3. That specification, the first of the two carpet-related charges, arises from a gift the Ambassador received in 2002 while serving as a Principal Officer at the U.S. Consulate in Jeddah, Saudi Arabia. At the end of the Ambassador's time in Saudi Arabia, Yahya Yahya, a Lebanese national working as a Business/Public Relations Director for the Saudi Bin Laden Construction Company, presented Ambassador Baltimore with a carpet. See A.R. 1011 (Stipulation 12). The Ambassador opened the package after arriving in Oman and displayed the carpet in his office there. Id. (Stipulation 13). At OIG's request, the ethics office provided an opinion letter as to the Ambassador's acceptance of the rug, concluding that "there is reasonable basis to reach a determination that" the Ambassador violated the regulation, id. at 339.

The Board sustained the specification, finding that the gift was from a prohibited source, 5 C.F.R. § 2635.202(a)(1), defined, in relevant part, as a person who "[d]oes business or seeks to do business with the employee's agency" or "[h]as interests that may be substantially affected by performance or nonperformance of the employee's official duties." 5 C.F.R. § 2635.203(d). (The Board also found that the gift was received "as a result of the employee's official position," independently violating 5 C.F.R. § 2635.202(a). See Bd. Decision 30.) Based in significant part on the Ambassador's own testimony, the Board found that the Saudi Bin Laden Construction Company, Yahya's employer, was "a major player on the economic scene in Saudi Arabia," that the company "does business occasionally with the U.S. Embassy in Saudi Arabia," and that it

"no doubt had significant interest in developing closer relations with the U.S. Embassy." Id. at 29-30. Because his company did business with the Embassy and had interests that were affected by the Ambassador's official duties, the Board concluded that Yahya, its representative, was a prohibited source. See 5 C.F.R. § 2635.203(d). The Board further found that the Ambassador did not establish that the personal friendship exception applied.

Ambassador Baltimore makes two arguments challenging the Board's decision. First, he contends that the gift was permitted under the personal friend exception to the regulation. That exception states that "[a]n employee may accept a gift given under circumstances which make it clear that the gift is motivated by a family relationship or personal friendship rather than the position of the employee." 5 C.F.R. § 2635.204(b). The Board explained that the personal friendship exception is only applicable if the gift is based "solely" on a personal relationship. Bd. Decision 30. Ambassador Baltimore never argues that this rule is arbitrary and capricious—nor would such an argument succeed given the regulation's requirement that circumstances "make it clear" that the motivation is personal, 5 C.F.R. § 2635.204(b). Instead, the Ambassador contends that there was no evidence as to Yahya's motivations, and that the Board placed undue weight on the ethics office letter finding a violation. These arguments fail to disturb the Board's factual findings. Rather than relying solely on the conclusions in the ethics office letter, the Board considered the evidence and "f[ou]nd that the evidence supports the conclusions reached" by the ethics office. Bd. Decision 31. It carefully laid out Yahya's relationship with the Ambassador, the circumstances of their meeting, their interactions while the Ambassador was in Saudi Arabia, and the relationship's termination after the Ambassador's departure. The Board stated that the ethics office found the personal friend exception inapplicable, and that for the exception to apply, "[t]he relationship would normally pre-date the officer's tour at the particular post." Id. at 30.

Based on these facts, the Board concluded that "[t]here is no question that the relationship between Yahya and the Embassy was based at least in part on doing business." Id. Moreover, it found that a reasonable person could discern "an appearance of impropriety" in the Ambassador's acceptance of the gift. Id. Again, the Board's inferences from the facts are entirely reasonable, its explanation is well-articulated, and its conclusion that the facts do not support the personal friendship exception is sound.

The Ambassador also points to a purported error in the Board's consideration of the personal friend exception—refusing to allow an expert witness, Ken Wernick, a former ethics official for the Environmental Protection Agency, to provide an opinion on the ethics office letter. Wernick sought to opine "on whether, based on the facts in the record . . . and his experience as an agency legal ethics counsel, Mr. Yahya was a prohibited source." Pl.'s Mot. 14. Additionally, he would have testified as to whether the ethics opinion letter could be offered "as a definitive conclusion of fact." Id. The Department objected to the witness on an array of grounds, arguing that his identification was untimely, that he would be offering an improper legal opinion, and that, as an official from a different agency, he lacked relevant expertise. In response, the Ambassador emphasized the limited points Wernick would establish. See A.R. 487. The Board excluded the witness, ruling that the Ambassador "can establish what it planned to obtain from Mr. Wernick from the testimony of Mr. Teddy Taylor," the deciding official. Id. at 601.

The Board has extremely broad discretion in evidentiary rulings. See Bettucci v. United States, 14 F. Supp. 2d 45, 55 (D.D.C. 1998) ("the [FSGB] is charged by applicable regulations to act as a gatekeeper in determining whether the presence of a witness is required at trial"); see also Guise v. DOJ, 330 F.3d 1376, 1379 (Fed. Cir. 2003) ("A determination to allow or exclude

witness testimony is within the sound discretion of the administrative judge."). It did not abuse that discretion here. Insofar as Wernick sought to opine on the ultimate legal issue before the Board, the Board could have properly concluded that such testimony was inadmissible. And insofar as Wernick would establish the limitations of the ethics office letter—limitations evident in the letter's own language, see A.R. 339—the Ambassador could establish these same facts by cross-examining the Department's witness, the deciding official who purportedly relied on the ethics letter. In any case, nothing in Wernick's proposed testimony could show that Yahya and the Ambassador had a "solely" personal relationship, or disturb the Board's sound inferences from the facts surrounding the pair's relationship and the status of Yahya's company, inferences that are reasonable even giving the ethics letter no evidentiary weight. The Board did not err; moreover, had it erred, the error would not have been prejudicial.

The Ambassador's second argument against this specification is that, pursuant to statute, the Department, rather than Ambassador Baltimore, accepted the gift. He relies on a Federal Register Notice containing a long list of gifts and reasons for their acceptance. The notice includes the carpet, listing it as accepted by the Ambassador "on behalf of the U.S. Government," and states that "[n]on-acceptance would cause the donor or the U.S. Government embarrassment." 71 Fed. Reg. 34678, 34707 (June 15, 2006). This is not the first time Ambassador Baltimore has raised the Federal Register notice in this litigation. He made the same argument when urging the Court to allow him additional discovery to obtain facts surrounding the notice's publication. Recognizing the notice's possible relevance, the Court remanded the issue to the Board to consider the bearing the notice would have had on the proceedings and, hence, the need for further discovery. See Order Remanding Case 3.

In its ensuing decision, the Board declined to reopen proceedings, explaining "that the Federal Register entry [was not] relevant to the charges regarding acceptance of the rug or the financial disclosure reporting requirement." Remand Decision 15. In reaching this conclusion, the Board emphasized that the purpose of the notice is to report acceptance of gifts from a foreign government or its representative. The Federal Register notice specifies that it is promulgated pursuant to 5 U.S.C § 7342(f), see 71 Fed. Reg. at 34678, and that statute defines gifts as items "tendered by, or received from, a foreign government," 5 U.S.C. § 7342(a)(3). The notice itself lists the gifts as "Gifts to Federal Employees From Foreign Government Sources." 71 Fed. Reg. at 34678. Yet it is evident that Yahya, a principal in a local construction company who was not even a Saudi citizen, was not a foreign government's representative. See Remand Decision 12. The Board noted the "casual and sometimes careless manner in which the Department handles" these Federal Register publications, emphasizing that "[t]here appears to be no filter or analysis of what gifts are submitted for publication in the Federal Register Notice." Id. at 13. Accordingly, it concluded that the carpet's inclusion in the notice was in error, and such erroneous publication could not transform the gift from Yahya into a gift from a foreign government accepted on behalf of the Department. The Board also reasoned that the Federal Register "might have had evidentiary impact" if the Ambassador "had made some effort to follow the regulations governing acceptance of a gift" from a non-governmental source "on behalf of the United States," but he did not do so. Id.

This Court has already indicated that the Board's reasoning is sound, stating that "[t]he Board assessed whether the Federal Register notice was relevant, and the Board decided, in a reasoned, 15-page order that it was not." Order Denying Discovery 8. Upon further evaluation—and focused now on the notice's relevance rather than the propriety of additional discovery—the

Court reaffirms this earlier assessment. The record is clear that Yahya represented no foreign government. The Ambassador treated the gift as his personal possession (and continues to maintain it was given to him by a friend), and made no effort to follow the extensive procedures intended to avoid an appearance of impropriety when a gift is accepted on behalf of the Department from a non-governmental source. Indeed, gifts accepted from private individuals or organizations on behalf of the Department "may not be retained by the employee," 3 Manual § 4122.1(c). Accordingly, the Board reasonably found that the Ambassador's treatment of the gift (displaying it in his office), his failure to comply with the procedures for accepting a gift on behalf of the Department (which both demonstrates his intent and creates an appearance of impropriety), and the weak evidentiary value of the Federal Register notice (given the fact that a gift from a private company fell outside the statutory parameters for acceptance on behalf of the Department and the haphazard publication of such notices) all supported the conclusion that the carpet was accepted individually. The Ambassador has pointed to no flaw that would warrant second-guessing the Board's judgment.

## II.        Charge 2: Failing to Report Gift of Carpet

The Board also sustained Charge 2, that the Ambassador failed to report the gift of the carpet on his 2002 Public Financial Disclosure Report (SF-278). See 5 C.F.R. § 2634.304(a). The parties stipulated that Ambassador Baltimore failed to report the gift on that form. A.R. 1012 (Stipulation 14). After the nondisclosure was brought to his attention by the OIG, the Ambassador reported the gift on his 2003 form without indicating that it was received during the previous filing year. See id. (Stipulation 15). It is also undisputed that the carpet was appraised in Oman at $1,235, id. at 1013 (Stipulation 36), well above the minimum reporting requirement. Based on these undisputed facts, the Board's finding sustaining this charge is beyond cavil.

But object plaintiff does. First, he contends that he was not required to report the rug on SF-278 because it was accepted on behalf of the Department, not by the Ambassador individually. This argument rests on the Federal Register notice and fails for the reasons discussed above.

Second, Ambassador Baltimore challenges the Board's finding that the carpet was worth more than $260, the minimum reporting requirement. See A.R. 986 (Sample SF-278 Form). He maintains that, although the carpet was appraised at $1,235 in Oman in 2004, the Department never proved that the rug would have been worth more than $260 in Saudi Arabia when he received it in 2002. The Board found that the proposition that the gift "would be nearly worthless in Saudi Arabia, but would command a value in excess of $1,000 in Oman a relatively short time later, stretches credulity," Bd. Decision 31. The Court agrees. The $1,235 appraisal more than suffices to establish, by a preponderance of the evidence, that the carpet was worth more than $260 when received. The Ambassador further argues that it would not "seem too much to ask of the Department" to "obtain a proper appraisal of the rug as of the time and place it was presented," Pl.'s Mot. 18. This argument is peculiar, as the Department had no knowledge that the gift was accepted until 2004 due to the Ambassador's very failure to report the gift on the 2002 form.

Third, the Ambassador maintains that the failure to report the carpet on the 2002 form did not amount to misconduct because he eventually reported the gift on the 2003 form. But he points to no de minimus exception to the reporting requirements. To the contrary, the applicable regulation requires reporting in the year the gift was received. See 5 C.F.R. § 2634.304(a) (all gifts over certain value "which are received by the filer during the reporting period" must be

included in the financial disclosure report (emphasis added)).[3] The Ambassador also argues that belated reporting is routine, and that officials are not disciplined for such delays. Nothing in the record establishes whether others were disciplined for similar conduct. Moreover, the Ambassador's conduct—failing to report the carpet until after displaying it in his office and being contacted by the OIG, see A.R. 250, and then omitting the date of receipt from the 2003 disclosure report, id. at 1012 (Stipulation 15); see also id. at 992 (copy of 2003 SF-278)— distinguishes his case from a run-of-the-mill reporting delay.

### III.    Charge 3: Willful Misuse of a Government-Owned Vehicle

The final charge against the Ambassador is that he violated 31 U.S.C. § 1349 and 5 C.F.R. § 2635.704 by authorizing his wife to use a government-owned vehicle. The statute provides:

> An officer . . . who willfully uses or authorizes the use of a passenger motor vehicle . . . owned or leased by the United States Government (except for an official purpose authorized by section 1344 of this title) . . . shall be suspended without pay . . . for at least one month, and when circumstances warrant, for a longer period or summarily removed from office.

31 U.S.C. § 1349(b). The Ambassador stipulated, and the Board found, that his wife used a government-owned vehicle from October 30, 2002, to June 11, 2003, for personal purposes, including driving their children to school, weekly shopping, and recreation. A.R. 1012 (Stipulation 18). In that time, she was involved in three accidents while using the vehicle. Id. at 1013 (Stipulation 28). The Ambassador also stipulated that this use violated Department regulations and the Embassy's written motor vehicle policy. Id. at 1012 (Stipulations 19 & 20). The sole disputed issue is whether the misuse was willful, as required by statute.

---

[3] And while the Ambassador points to a provision that imposes a late filing fee when a particular financial disclosure report is filed more than thirty days late, 5 C.F.R. § 2634.704(a), that says nothing about the penalty for omitting an item altogether from a timely filed report.

Before the Board, the Ambassador argued that the conduct was not willful because he paid usage fees for the vehicle and because he relied on the statements of Terry Eastham—the General Services Officer ("GSO") who supervised the embassy motor pool—that use by a spouse would be appropriate. Nonetheless, the Board found against him. Applying the Federal Circuit's reading of this statute, the Board reasoned that misuse is willful where "the employee had actual knowledge that the use would be characterized as 'non-official,' or if he acted in reckless disregard as to whether or not the use was for non-official purposes." Bd. Decision 34 (citing Felton v. EEOC, 820 F.2d 391, 393 (Fed. Cir. 1987)). The Board found that, "[e]ven assuming" that Eastham took the initiative, the evidence supported reckless disregard by the Ambassador "and most likely . . . actual knowledge" that his wife's use would be characterized as non-official. Id. The Board emphasized that Ambassador Baltimore admitted that he did not review the Embassy's policy and never inquired as to whether use of the government-owned vehicle by his wife was legal or appropriate. The Board emphasized his repeated ethics training, "which would have covered the legal and appropriate uses of [government-owned vehicles]" and that he had been the official in charge of ensuring compliance with Embassy rules about such vehicles at prior posts. Id. at 33. The Board found that the Ambassador had ultimate responsibility for the decision to use the vehicle, and it noted that "the Ambassador is held to a higher standard of conduct," which "makes his apparent incuriosity and passivity regarding the rules even more perplexing." Id. at 35. The Board also found that periodic payments did not diminish the Ambassador's responsibility because the statute and regulations set specific, narrow circumstances in which such use by a family member with payment to the embassy is appropriate, but the use in this case fell into none of those circumstances and did not follow the requisite procedures. Id. at 34-35.

The Federal Circuit, which reviews decisions by the similar Merit Systems Protection Board, has on occasion set aside that body's findings of willfulness when the propriety of government-owned vehicle use is unclear. In one case, an employee authorized a subordinate, the office's only typist, to use a government-owned vehicle to secure her personal vehicle that had broken down on the expressway. The employee believed that this one-time use would allow the typist to return as quickly as possible permitting the office to continue to address its backlog of work. Felton, 820 F.2d at 392-93. The Federal Circuit concluded that there was no evidence that the employee's "authorization was in reckless disregard of whether the use was for other than official purposes" because the nature of the use in such a circumstance was a discretionary question and the employee's conclusion was reasonable. Id. at 394. In another case, an employee used a government-owned vehicle to transport his son to day care on a few occasions when his wife was placed on bed rest due to complications with her pregnancy. The employee was on call at all times due to a dangerous investigation, the government-owned vehicle contained specialized equipment necessary to remain in contact with the agency, and dropping his son off in his personal vehicle then returning for the government-owned car would result in a lengthy detour. Kimm v. Dep't of the Treasury, 61 F.3d 888, 889-90 (Fed. Cir. 1995). The court held that the employee was not reckless in reasoning that using the vehicle in this limited way would constitute an official purpose. Id. at 893.

In contrast to these cases, the Ambassador's use here was plainly non-official. The use of government-owned vehicles for personal purposes without any exigency is squarely prohibited. See 31 U.S.C. § 1349(b); see also 31 U.S.C. § 1344 (listing official purposes). The Embassy's written policy is similarly clear. See A.R. 1562-65. The Ambassador even initialed the policy, which was circulated to all employees. See id. at 1565. The non-official nature of the use should

have been all the more apparent because rental cars were available, and, indeed, used by the Ambassador's wife for the first weeks of her time in Oman. See Bd. Decision 32. The gravity of the statute's mandatory penalty confirms the issue's seriousness and makes the Ambassador's plea of ignorance difficult to believe. At the hearing, the Ambassador could articulate no past practice that authorized such use of government-owned vehicles by spouses. A.R. 885. His failure, over several months, to consult anyone about a use that is so far outside the ordinary—despite his position, his extensive ethics training, and his role in enforcing policies—raises a strong inference that he was at least reckless in assuming his wife's use would be deemed official, and hence the Board was well within its discretion to draw that inference. Indeed, if an Ambassador cannot be deemed reckless in these circumstances, it is difficult to see how anyone can be found to willfully misuse a government-owned vehicle.

The Ambassador argues that the Board committed a specific error when it excluded GSO Eastham as a live witness on this charge. Ambassador Baltimore sought to call Eastham as a witness on the last day of the hearing without having included him on the witness list and despite having had two weeks' notice that the Department had contacted Eastham. Id. at 1384-85. The Board declined the request "at this 11th hour-plus," id. at 1390, explaining that other witnesses had already testified about the vehicle and it would not be feasible to recall them to ask about Eastham's testimony. The Board also stated that, based on the Ambassador's proffer, the testimony would be repetitive of what other witnesses had presented. Id. at 1390-91. The Board's decision to exclude a last-minute witness based on the hearing's logistics lies well within its broad discretion. See Guise, 330 F.3d at 1379. And even if the Board had erred (which it did not), the Ambassador suffered no prejudice because the Board assumed a favorable version of Eastham's testimony despite his absence as a live witness and still found the Ambassador's

conduct willful. <u>See</u> Bd. Decision 33 (considering Ambassador's testimony as to what Eastham told him); <u>id.</u> at 34 ("assuming" that Eastham took the initiative in arranging car for Ambassador's wife); <u>id.</u> at 16 ("even if Mr. Eastham testified [pursuant to Ambassador's offer of proof] . . . such testimony would not have absolved the grievant").

Finally, the Ambassador argues that the Board's decision as to this charge was arbitrary and capricious because "it failed to acknowledge the similar acts of other Embassy employees" who committed similar violations "yet were not similarly disciplined." Pl.'s Mot. 30. Ambassador Baltimore asserts that Robert Dry, an employee at the Embassy, also used a government-owned vehicle for personal purposes for over a year, yet "[t]here is no evidence that Mr. Dry was ever charged with willful misuse of [the vehicle]." <u>Id.</u> at 31. This argument falls short: by the Ambassador's own admission, Dry was never charged with willful misuse. Accordingly, his case was never before the Board. Certainly the Board must use consistent rules in considering similar charges, but the Court cannot conclude that the Board acted arbitrarily and capriciously by sustaining a charge that was brought against one official just because a charge was not brought against a different employee in arguably similar circumstances. By the Ambassador's logic, if the Department declines to bring charges in some cases, it loses authority to do so in others. He offers no support for this proposition.

## IV.   Timeliness

The Ambassador argues that all charges against him should be dismissed because the Department's actions were not carried out in a "timely" manner as required by its regulations, <u>see</u> 3 Manual § 4321 ("Disciplinary procedures will be carried out in a fair, timely, and equitable manner."). The investigation of the Ambassador's conduct concluded in October 2004, but

despite his repeated status inquiries, the proposal to discipline him was issued more than seventeen months later in March 2006. See Bd. Decision 13. The Board found that the Department's actions were, indeed, untimely, but that Ambassador Baltimore was not prejudiced by the delay. Because Board precedents require "a nexus between the delay in proposing discipline and demonstrable prejudice or harm to the employee in presenting his or her defense," id. at 14 (citing two past Board decisions), the Board sustained the charges notwithstanding the timing issue.

The Ambassador argues that he was prejudiced because two helpful witnesses became unavailable due to the delay. One prospective witness, Michael Senko, who conducted periodic inspections of the Embassy's operation in Oman and apparently had a highly positive impression of the Ambassador, became ill at the time of the hearing and was unable to testify. Id. at 15. The Board found that his unavailability was not attributable to the delay but "was simply due to the unfortunate coincidence" that his illness occurred at the time of the hearing. Id. The Board also noted Senko's testimony would be ancillary, and found that his absence did not prejudice the Ambassador. Id. at 15-16. The Court has no basis to disturb these findings. The second prospective witness was GSO Eastham. As discussed earlier, Eastham was excluded because of the Ambassador's delay in identifying him as a witness; indeed, the Ambassador asserts that "Eastham was available to testify on the last day of hearing," Pl.'s Mot. 31. The Department's delay in proposing discipline hence in no way prevented his testimony. Finally, even if the exclusion had been attributable to the delay, it was not prejudicial. The Board explicitly found that "even if Mr. Eastham testified" pursuant to his proffer "such testimony would not have absolved the grievant." Bd. Decision 16.

Ambassador Baltimore also contends that he was prejudiced because the Department's delay caused him to lose pay awards in 2003, 2004, and 2005, and to lose opportunities to serve in other ambassadorial positions. The Board rejected this argument, finding that even if the discipline had been more timely issued, the appeals process would have continued through 2005. Because names are removed from consideration for pay awards until disciplinary matters are resolved, the Ambassador would still have been ineligible for the awards. See id. at 17.[4] As for the opportunity to serve in ambassadorial positions, the Board found that, due to his impending retirement date, Ambassador Baltimore would have been "subject to the Department's exercise of discretion in deciding that he should retire upon completion of his current ambassadorial assignment in March 2006, regardless of when discipline against him was proposed." Id. at 18 (footnote omitted). The delay in finishing the disciplinary process thus had no bearing on the lost opportunity. This is especially so given that the Board would simply have sustained the charges earlier, and the sustained charges, at least as much as pending charges, would counsel against extending the retirement date.

The Ambassador also contends that the delay was intentional. To begin with, this is irrelevant because the Board properly found there was no prejudice. Although the Ambassador argues that intentional delay requires dismissal of the charges "as a matter of law," Pl.'s Mot. 37, he cites only a patent case concerning the equitable defense of prosecution laches by which "a patent [may become] unenforceable when it has issued only after an unreasonable and unexplained delay in prosecution," Symbol Techs., Inc. v. Lemelson Med., Educ. & Research Found., LP, 422 F.3d 1378, 1385 (Fed. Cir. 2005). That holding has no bearing on the issue here.

---

[4] What's more, if any charges were set aside, the Ambassador would again be considered for the pay awards. See Bd. Decision 17. It is only the combination of the pending charges and the fact that they were ultimately sustained that results in nonpayment.

By contrast, Board precedents—which do have bearing—clearly require prejudice from a delay in proposing discipline. <u>See</u> Bd. Decision 14 (citing cases). Moreover, even insofar as investigators chose to proceed more slowly, making the delay "intentional" in one sense, the record offers no support that the delay was in bad faith. Rather, the record indicates that officials were working to address the novel circumstance of disciplining a sitting ambassador. <u>See</u> <u>id.</u> Ambassador Baltimore presents no support for the proposition that a good faith, albeit deliberate, delay that causes no prejudice warrants dismissal of the charges.

Seeking to invalidate the charges based on the delay, Ambassador Baltimore also makes a constitutional due process argument. This argument is forfeited because he did not raise it before the agency. <u>See</u> <u>BNSF Ry. Co. v. Surface Transp. Bd.</u>, 453 F.3d 473, 479 (D.C. Cir. 2006) ("A reviewing court generally will not consider an argument that was not raised before the agency . . . ."). The argument would also fail on the merits—the Ambassador received a full hearing before any suspension was imposed. His case is not comparable to one where a delay between the imposition of the adverse action and a hearing raises Due Process questions. <u>See</u> <u>Cleveland Bd. of Educ. v. Loudermill</u>, 470 U.S. 532, 547 (1985) ("The Due Process Clause requires provision of a hearing at a meaningful time. At some point, a delay in the <u>post-termination</u> hearing would become a constitutional violation." (emphasis added) (citation and internal quotations marks omitted)). The Supreme Court has never suggested that a hearing that takes place before the adverse action must also occur promptly after the violation to be meaningful. Even the high-water mark of Due Process Clause enforcement, <u>Goldberg v. Kelly</u>, 397 U.S. 254 (1970), simply required an evidentiary hearing prior to the adverse government action, <u>see</u> <u>id.</u> at 266-67. That occurred here.

**V.      Penalty**

Finally, the Ambassador argues that the 45-day suspension is excessive and unreasonable. This argument is forfeited because he did not raise the penalty's reasonableness before the Board until the motion for reconsideration. Compare BNSF Ry. Co., 453 F.3d at 479 (argument raised before agency only in petition for reconsideration forfeited where issue could have been presented in earlier agency proceedings), with Bd. Decision 35 ("The parties have not raised an issue over the reasonableness of the Department's decision to impose a 45-day suspension on Ambassador Baltimore.").

Had it been preserved, the argument would also fail on the merits: the Board found that the 45-day suspension was within management's discretion to determine appropriate discipline, noting that willful misuse of a government-owned vehicle alone carries a mandatory minimum 30-day suspension. Misuse of the vehicle over the course of several months amply justifies the 45-day penalty, and when that penalty for the vehicle charge is combined with one for the other two charges, including "the acceptance and failure to report the gift of a valuable hand-woven rug," Bd. Decision 36, a 45-day suspension is unimpeachable. See Cabrera v. U.S. Postal Serv., 333 F. App'x 559, 564 (Fed. Cir. 2009) (per curiam) ("We will not disturb an agency's choice of penalty so long as the agency considered the relevant factors and exercised discretion within tolerable limits of reasonableness.").

The Ambassador's two specific objections go nowhere. First, he cites the Board's policy "to remand the penalty question to the agency" where "the Board does not sustain all of the charges." See FSGB Annual Report for the Year 2004, at 14, available at http://www.fsgb.gov/ Search/docs/Public/Other/AnnualReport2004.pdf. He argues that "given the FSGB's reversal of two charges," Pl.'s Mot. 41, the Board should have remanded the remaining charges to the Department. This rests on a false premise: the Board sustained all three charges. It found only

that two specifications under Charge 1 were not proven. Ambassador Baltimore has offered no authority that the Board's policy is always to remand in such circumstances. Given the Board's persuasive analysis of the penalty's reasonableness and the minor nature of the dismissed specifications relative to those sustained, declining to remand was neither arbitrary nor capricious.

The Ambassador also argues that the Board failed to consider requisite factors, such as the nature and seriousness of the offense, whether the offense was intentional or inadvertent, and mitigating circumstances. But the deciding official, whose decision the Board reviewed, fully considered those factors, see A.R. 1272-73, and the Board approved his decision, endorsing the analysis while further commenting on the penalty's overall reasonableness.

As is true for the rest of its decision, then, nothing about the Board's penalty determination even remotely warrants reversal.

## CONCLUSION

For these reasons, Ambassador Baltimore's motion for summary judgment will be denied and the Department's cross-motion will be granted. A separate order has been issued on this date.

/s/
_____
JOHN D. BATES
United States District Judge

Dated: October 25, 2012